IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 18-cv-02453-RBJ

ROCK & RAIL LLC, a Colorado limited liability company,

 Plaintiff,

v.

MOTHERLOVE HERBAL COMPANY, a Colorado corporation,
INDIANHEAD WEST HOMEOWNERS ASSOCIATION, INC., a Colorado nonprofit corporation,
ROCKIN S. RANCH, LLC, a Colorado limited liability company,
JOHN CUMMINGS, an individual,
DAVID KISKER, an individual,
GARY OPLINGER, an individual,
WOLFGANG DIRKS, an individual, and
JAMES PIRAINO, an individual,

 Defendants.

## ORDER

This case is before the Court on defendants and counterclaimants John Cummings, Wolfgang Dirks, Indianhead West Homeowners Association, Inc., David Kisker, Gary Oplinger, James Piraino, and Rockin S Ranch LLC's motion for partial summary judgment, ECF No. 80. For the reasons stated below, the motion is denied.

## BACKGROUND

Rock & Rail, LLC ("Rock & Rail") is a Colorado LLC owned by Martin Marietta Materials ("Martin Marietta") that operates an "intermodal rail facility" in Weld County, Colorado. ECF No. 1. The facility was constructed pursuant to a "Use by Special Review" ("USR") permit issued by Weld County to Martin Marietta. ECF No. 80 at 3. In the permit

application Martin Marietta described the facility as an "aggregate transloading facility with concrete batch plant," and noted that the facility would produce concrete. *Id*. at 4.  In order to approve the building permit, Weld County charged over $23,000 in "manufacturing/industrial" fees.  *Id*.  The facility receives gravel, sand, cement, and other materials from a quarry in Wyoming for storage, transport, and some amount of concrete manufacturing, the extent of which is in dispute.  *Id*.; ECF Nos. 1, 82.

Defendants, local landowners, appealed the Weld County USR permit approval to the District Court of Weld County, and subsequently to the Colorado Court of Appeals.  ECF No. 82 at 2.  On November 22, 2017 the Court of Appeals overturned the permit approval, finding that Martin Marietta had provided insufficient evidence that the proposed use would be compatible with existing surrounding uses.  ECF No. 80-7.  Shortly after the decision Martin Marietta sold the facility to Rock & Rail.  ECF No. 80 at 5.  Despite the permit revocation Rock & Rail began operating the facility, including the concrete manufacturing components.  *Id*.

On September 26, 2018 Rock & Rail brought this lawsuit seeking a declaratory judgment that the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501(b), preempts the Weld County permit requirement, and that Rock & Rail is therefore not required to obtain any local permission to continue its operations.  ECF No. 1 at 10.  On October 18, 2018 defendants filed an answer, ECF No. 16, including counterclaims for declaratory relief.  On February 7, 2020 defendants moved for partial summary judgment on their first counterclaim, asking this Court to find that the ICCTA does not preempt Weld County's regulation of Rock & Rail's concrete manufacturing operations.  ECF No. 80.

**STANDARD OF REVIEW**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**ANALYSIS**

Rock & Rail argues that the facility only engages in "transloading" goods and materials between modes of transportation. ECF No. 82 at 9. As such, under the ICCTA all its activities should fall within the exclusive jurisdiction of the Surface Transportation Board ("STB"). Defendants argue that in addition to transloading, Rock & Rail also engages in concrete manufacturing, which is not preempted by the ICCTA and is subject to Weld County regulation.

The ICCTA broadly grants jurisdiction to the STB over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . . ." 49 U.S.C. § 10501(b)(2). "This broad jurisdictional grant is coupled with an

express preemption clause mandating that '[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State Law.'" *Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008) (quoting § 10501(b)); *see also Fox v. Surface Transp. Bd.*, 379 F. App'x 767 (10th Cir. 2010) (unpublished).

Preemption can be express or implied. *Id.* But Rock & Rail argues only that the ICCTA's language in § 10501(b) expressly preempts all "transloading" activities. ECF No. 82 at 9. I therefore only consider whether there is a genuine dispute of material fact as to whether Rock & Rail's activities fall under the ICCTA's express preemption clause.

### A. <u>ICCTA Express Preemption</u>

Express preemption occurs when Congress "define[s] explicitly the extent to which its enactments pre-empt state law." *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir. 2000). The ICCTA expressly preempts only local "regulation of rail transportation." *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (quoting § 10501(b)).

The ICCTA defines "transportation" as

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

§ 10102(9)(A)–(B). "While certainly expansive, this definition of 'transportation' does not encompass everything touching on railroads." *Emerson*, 503 F.3d at 1129. For example, in *Emerson v. Kansas City South Railway Co.* the Tenth Circuit found that a railway company's discarding of old railroad ties into a wastewater drainage ditch adjacent to its tracks did not fall within the preempted "transportation." *Id*. at 1130. The railway's actions did not focus on

"physical instrumentalities related to the movement of passengers or property," nor "services related to that movement." *Id*. (quoting § 10102(9)) (internal quotations omitted). "These acts . . . are not instrumentalities of any kind related to the movement of passengers or property or services related to that movement. Rather, they are possibly tortious acts committed by a landowner who happens to be a railroad company." *Id*. (quoting § 10102(9)) (internal quotations omitted).

The parties agree that only activities "integrally related" to rail transportation fall within the ICCTA's express preemption. ECF No. 80 at 15; ECF No. 82 at 11. They disagree about whether Rock & Rail's concrete manufacturing falls into this category of activities. Rock & Rail argues that its concrete manufacturing only amounts to "transloading," which it defines as the "interchange of goods and materials between rail and other forms of transportation." ECF No. 82 at 9. Defendants claim that Rock & Rail's activities fall outside the scope of transloading.

Transloading activities are covered by the ICCTA's express preemption. In *New York Susquehanna & W. Ry. Corp. v. Jackson*, the Third Circuit found that "transloading" was integrally related to transportation, while independent manufacturing was not. 500 F.3d 238, 248 (3d Cir. 2007); *see also Padgett v. Surface Transp. Bd.*, 804 F.3d 103, 108 (1st Cir. 2015); *Green Mountain R.R. Corp. v. Vt.*, 404 F.3d 638, 642 (2d Cir. 2005). The Third Circuit relied on an STB decision holding that if a "facility is not integrally related to providing transportation services, but rather serves only a manufacturing or production purpose, then, like any non-railroad property, it would be subject to applicable state and local regulation." *Id*. at 247 (quoting *Borough of Riverdale Petition for Declaratory Order the New York Susquehanna & W. Ry. Corp.*, 4 S.T.B. 380, 1999 WL 715272 (1999)). However, the court declined to decide whether the railroad's sorting of recyclables from waste before disposal was part of the

transloading process. *Id*. at 249. Instead, the court concluded that the state regulation in question did not address the sorting or processing aspect of the facility. *Id*. Rather the regulation focused on the storage and transloading aspects of the facility and was therefore squarely preempted by the ICCTA. *Id*.

The First Circuit has recently articulated several helpful tests for determining what kinds of activities are covered by ICCTA preemption. In *Padgett v. Surface Transportation Board*, the court held that

> Whether a particular activity constitutes transportation . . . is a case-by-case, fact specific determination based on . . . factors including (1) whether the rail carrier holds out transloading as part of its business, (2) the degree of control retained by the [rail] carrier, (3) property rights and maintenance obligations, (4) contractual liability, and (5) financing.

804 F.3d 103, 108 (1st Cir. 2015) (quoting *Texas Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 530 (5th Cir. 2012)) (internal quotations omitted).

The same day the First Circuit issued *Padget*, it also issued a companion case specifically considering what activities constitute transloading under the ICCTA. *See Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 118 (1st Cir. 2015). Relying on the Tenth Circuit opinion in *Emerson*, the court in *Grosso v. Surface Transportation Board* held that the proper inquiry is "whether the activities . . . facilitated the physical movement of passengers or property." *Id*. at 119. It noted that "manufacturing and commercial transactions that occur on property owned by a railroad that are not part of or integral to the provision of rail service are not embraced within the term 'transportation.'" *Id*. at 118 (quoting *New England Transrail, LLC, d/b/a Wilmington & Woburn Terminal Ry.–Constr.*, Fed. Carr. Cas. P 37241, 2007 WL 1989841, *6 (STB June 29, 2007)) (internal quotations omitted). The court found that the STB had failed to relate the railroad's "vacuuming, screening, bagging, and palletizing" of wood pellets to the "movement of

passengers or property." *Id*. at 119.  The court remanded to the STB to rule in light of this holding.  *Id*. at 120.

Because I find the *Grosso* test directly applicable to the question of whether Rock & Rail's concrete manufacturing activities constitute transloading, and because the court in *Grosso* relied on *Emerson*, the most recent Tenth Circuit case considering similar issues,[1] I apply this test to the facts here.  I examine whether Rock & Rail's concrete manufacturing activities facilitate the physical movement of property.  This inquiry is not clear cut, as the parties dispute the nature of Rock & Rail's concrete manufacturing.

### B. Rock & Rail's Concrete Manufacturing

The parties more or less agree on the following facts: when Martin Marietta applied for the USR permit, it described the facility as an "aggregate transloading facility with concrete batch plant," noting that the facility would be used for the "production" of concrete.  ECF No. 80 at 3–4.  Martin Marietta operates similar concrete batch plants that are not attached to rail transloading facilities.  *Id*.; ECF No. 82 at 8.  Martin Marietta paid Weld County more than $23,000 in "Manufacturing/Industrial" fees related to the building permit.  *Id*. at 4.

As the new owner, Rock & Rail stores aggregate in piles at the facility to await either trucking offsite in dump trucks as "raw" aggregate, or concrete "batching" to be loaded into "ready-mix" concrete trucks.  *Id*. at 5–6; ECF No. 82 at 7–8.  The facility is divided into the "aggregate business unit" which unloads the trains and stockpiles aggregate inventory in storage, and the "ready mix business unit" which operates and maintains the concrete batch plant and

---

[1] More recent Tenth Circuit cases consider ICCTA preemption issues, *see Fox v. Surface Transp. Bd.*, 379 F. App'x 767 (10th Cir. 2010) (unpublished) (considering whether rail was abandoned and therefore not preempted by the ICCTA); *Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008) (holding that ICCTA preempts state tort claims related to rail lines).  However, *Emerson* is informative here because it, unlike the more recent cases, explicitly considers what activities constitute "transportation" under the ICCTA's preemption clause.

7

loads the ready-mix trucks. ECF No. 80 at 7. At some points in the past, aggregate has been delivered to the facility for storage and manufacturing via truck rather than via rail. ECF No. 82 at 8. The facility also stores the other additives required to make concrete (including fly ash and cement), which are not delivered by rail. ECF No. 80 at 8. Rock & Rail estimates that 50 percent of the ingredients used to manufacture concrete at the facility arrive by truck, not rail. *Id*. at 9.

The facility manufactures concrete in two ways: either through a "transit mix" wherein the raw materials are loaded directly into the ready-mix truck, water is added, and the concrete is mixed within the truck drum, thus taking place partially on-site and partially off-site. Alternatively, the concrete can be "central batch mixed," wherein the ingredients are mixed in a stationary mixer on-site, then transferred to a ready-mix truck that continues the mixing process off-site. ECF No. 82 at 5. Rock & Rail does not own the ready-mix trucks. *Id*. at 6. After the concrete has been mixed it must be delivered to the customer in a ready-mix truck within 90 minutes. *Id*.

The parties dispute most everything else about Rock & Rail's concrete manufacturing. They dispute whether the concrete batch plant is "physically separate" from the rest of the facility's operations, how long the facility stores aggregate, and whether the facility continues to receive aggregate from non-rail methods of transportation. ECF No. 82 at 7–8. They also dispute the purpose of the aggregate stockpiling. According to defendants, Rock & Rail's concrete manufacturing does not depend on rail transportation because it stockpiles aggregate at all times in order to ensure it can meet its customers' needs and manufacture concrete regardless of whether it is receiving aggregate by rail. ECF No. 80 at 9. Rock & Rail argues its ability to make concrete does depends on rail transportation. ECF No. 82 at 8. Rock & Rail

8

acknowledges that it stockpiles aggregate to ensure it will not be depleted before the next train arrives but argues that the regular arrival of aggregate by train is essential to its ability to manufacture concrete. ECF No. 82 at 8.

They also dispute central questions such as whether Rock & Rail actually "manufactures" concrete. ECF No. 82 at 5–6. Rock & Rail argues that in both the transit mix and central batch mix, the materials loaded into the truck are not yet concrete because they have only been partially mixed. ECF No. 82 at 5–6. According to Rock & Rail, the chemical reaction required to produce concrete only occurs after the concrete is mixed in the ready-mix trucks, after the ready-mix trucks have left the facility. *Id*. In their view, "the customers oversee" the chemical reaction that results from mixing, conduct quality control tests, and add water to the mixture as needed. *Id*. In this sense, Rock & Rail claims it does not manufacture concrete, but rather only transloads the materials into the ready-mix trucks, which then complete the manufacturing process off-site. *Id*.

Rock & Rail has raised a genuine dispute as to whether concrete batching constitutes transloading under the *Grosso* test. Specifically, there is a dispute as to whether Rock & Rail's concrete batching simply "facilitate[s] the movement of . . . property," transported by rail or whether it constitutes an independent, non-rail transportation related manufacturing activity. *See Grosso*, 804 F.3d 110, 119. The facts the parties dispute go directly to this question. Whether the facility stores aggregate only for short periods as it awaits transportation or for longer terms, transporting only as batches are ordered by customers, helps determine whether the batching process merely facilitates the movement of property or whether it constitutes independent manufacturing. Whether concrete batching would occur regardless of its receipt of aggregate by rail goes to whether it engages in batching to facilitate the movement of property received by

rail. Similarly, at what point concrete is "manufactured" determines whether the batching process constitutes the transloading of raw materials, or the manufacture of an independent product. The parties have each provided evidence on these issues, including the testimony of multiple experts. *See*, *e.g.*, ECF Nos. 80-13; 80-17; 80-20; 82-1; 82-3; 82-4.

Rock & Rail argues that these factual disputes preclude summary judgment. ECF No. 82 at 20. I agree. The facts are material because under the substantive law, they are "essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. The dispute is genuine because, at the summary judgment stage I must make all inferences in favor of Rock & Rail, and in doing so, I cannot conclude that a reasonable jury could not find that its activities constitute transloading under the ICCTA. *See Anderson*, 477 U.S. at 248. As the First Circuit noted in *Padget*, "[w]hether a particular activity constitutes transportation . . . is a case-by-case, fact specific determination." 804 F.3d at 108. I find that I cannot make this determination when so many material facts remain in dispute.

## ORDER

Defendants' Motion for Summary Judgment, ECF No. 80, is DENIED.

DATED this 2nd day of April, 2020.

BY THE COURT:

*[signature: Brooke Jackson]*

_____
R. Brooke Jackson
United States District Judge